IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MUNEEB AKHTER<br>a/k/a MICKEY AKHTER<br>a/k/a MUNIB AKHTER<br><br>and<br><br>SOHAIB AKHTER<br>a/k/a SUHAIB AKHTER,<br><br>Defendants. | Case No. 1:25-CR-307<br><br>Hearing: Jan. 28, 2026 |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO REVOKE THE DETENTION ORDER [DKT. 50]**

The United States of America, by and through undersigned counsel, opposes the motion of

defendant SOHAIB AKHTER to revoke his detention order in this case. There are no conditions

of release that will reasonably assure the defendant's presence at future court hearings or the safety

of the community. Thus, the defendant's motion to revoke the detention order should be denied.

**BACKGROUND**

*Conspiracy to Commit Computer Fraud and to Destroy Records*

From March 2024 until his termination on February 18, 2025, the Sohaib served as an

employee of Company-1. Company-1 is a federal government contractor headquartered in

Washington, D.C. that provides services related to software and personnel to government agencies.

Company-1 provides case management software to a significant number of federal inspectors

general offices in a product known as eCase. eCase contains sensitive investigative information

and is used by approximately ten Office of Inspector General (OIG) offices. The company also

sells agencies a Freedom of Information Act (FOIA) request management product

called FOIAXpress, which also generally holds a significant amount of sensitive government information and personally identifiable information (PII).

When Company-1 discovered the defendant's twin brother and co-defendant Muneeb had falsified his job application and failed to disclose his prior felony conviction, it terminated both brothers. On February 18, 2025, two human resources (HR) employees of Company-1 scheduled a Microsoft Teams meeting with Sohaib and Muneeb. Sohaib recorded the meeting starting at 4:48 p.m. Eastern Standard Time. The HR personnel left the meeting approximately 2 minutes and 40 seconds into the recording. Apparently unbeknownst to the defendants, the meeting continued recording the next hour of interactions between the brothers:

| Video Timestamp | Relevant Activity |
|---|---|
| 2:40 | HR staff leave the Microsoft Teams meeting. |
| 7:34 | **SOHAIB**: "Still connected? Still on the VPN?" |
| 8:00 | **SOHAIB**: "Delete all their databases?" <br> **MUNEEB**: "Eh, they can recover them…backups, I'm pretty sure." <br> **SOHAIB**: "Daily backups?" <br> **MUNEEB**: "Yup." |
| 8:22 | **SOHAIB**: "What's the plan [then]? We gonna take care of severance or are we gonna do something about…" "Should we retort to whatever they send us by saying we need $25,000 each? Hm?" |
| 10:05 | **MUNEEB**: "We are doing petty shit now." |
| 16:36 | **MUNEEB**: "I'm going to wipe my computer clean." |
| 17:00 | **SOHAIB**: "I can't access the system but I still have the email address for their customers for eCase and FOIAXpress." |
| 17:30 | **MUNEEB** and **SOHAIB** discuss being compensated by Company-1. <br> **MUNEEB**: "I'm not gonna threaten them shit, that's like could be shown as some sort of . . ." <br><br> **SOHAIB**: "It depends on how you write it. Just say, 'according to our previous agreement, this is the tally of the amount that I've been [paid], if you pay it up front, then I have no reason to communicate with customers.'" <br> **MUNEEB**: "I'm good." |

| | |
|---|---|
| | **SOHAIB**: "Whatcha working on man?" |
| | **MUNEEB**: "Nothing important, man." |
| | **SOHAIB**: "Why won't you tell me? I ain't gonna snitch." |
| | **MUNEEB**: "Don't need to. Don't worry about it." |
| | **MUNEEB**: "People are logged out for the day, this is the perfect time." |
| | **SOHAIB**: "How do you still have access? When did you connect to their VPN?" |
| | **MUNEEB**: "10 minutes before their stupid meeting." |
| | **SOHAIB**: "You might still have access to it until the end of the day. Until at least 6 hours." |
| 18:35 | **MUNEEB**: "Don't worry about it man. Don't worry about it." |
| 19:35 | **SOHAIB**: "I see you are cleaning out their database backups." |
| 20:04 | **MUNEEB**: <br><br>"Don't worry about it. You don't do nothing. Don't try nothin'. They are looking at you, they are not looking at me." |
| 20:25 | **SOHAIB**: "[G]oing to RDP into their systems and delete all their data." |
| 21:10 | [inaudible]<br><br>**SOHAIB:** "The ramifications for that would be worse though."<br><br>**MUNEEB:** "What are you talking about?   I didn't do nothing. They closed my access when they had that meeting."<br><br>**SOHAIB:** "Alright, if you have good plausible deniability."<br><br>**SOHAIB** and **MUNEEB** then have additional discussion about deleting backups and changing DNS information.<br><br>**MUNEEB**: "Eh, they can recover from yesterday. [The IT manager] will have some work to do." |
| 22:10 | **MUNEEB** and **SOHAIB** discuss Company-1 customers, including Veteran's Affairs OIG, Education Department OIG, DHS OIG, and customer data. |
| 22:32 | **MUNEEB**: "DHS was a big [customer]."<br><br>**SOHAIB**: "Just go into each of them and start the delete process. It will take its time. . . It will eventually delete all their files."<br><br>**MUNEEB**: "Sabes, don't say nothin', OK, don't worry about it."<br><br>**SOHAIB**: "I ain't sayin' shit." |
| 24:47 | **SOHAIB**: "You should have thought about it prior man"<br><br>**MUNEEB**: "What do you mean? Like had a kill script, what do you mean?" |
| 24:58 | **SOHAIB**: "Blackmailing them in for some money would've been…" |
| 25:00 | **MUNEEB**: "No, you do not do that. That's proof of guilt, man." |

| | |
|---|---|
| | **SOHAIB**: "No but the thing was you always have your opinion, I could just communicate with their customers." |
| | **MUNEEB**: "Communicate with their customers is a different thing!" |
| | **SOHAIB**: "So you're saying these are two separate things?" |
| | **MUNEEB**: "There ya go. Go say that man, go argue for that, then they'll think you're the one behind this shit." |
| | **SOHAIB**: ". . . They're gonna probably raid this place." |
| | **MUNEEB**: "Eh, I'll clean this shit up. I don't got shit." |
| | **SOHAIB**: "We also gotta clean stuff up from the other house man." |
| | **MUNEEB**: "Get rid of that shit." |
| 27:10 | **SOHAIB**: "Deleting their filesystems would be a harder fix."<br>**MUNEEB**: "Mhhmm, especially if you clear it out."<br>**MUNEEB**: "Everything that I did, I'm making sure it's protected. That it's clean." |
| 42:49 | **MUNEEB**: "Don't worry, we'll go to Texas." |

Law enforcement obtained several terabytes of virtual machine images containing SQL Server logs from Company-1, which were analyzed by the DHS Cyber Forensics Laboratory. Sohaib unsuccessfully attempted to access Company-1's computer network during the above interaction.

The server logs showed that approximately 96 databases (including backups and temporary databases) were deleted on February 18, 2025. As of December 2025, Company-1 estimates its estimated loss of at least $900,000. This estimate does not include lost revenue, which may be significant. The loss to the federal agencies is ongoing and burgeoning. As of August 2025, reported losses exceed $1 million; overall, losses are expected to exceed $3.5 million, resulting in at least an 18-point increase under the U.S. Sentencing Guidelines, § 2B1.1(b)(1)(J).

*Password Trafficking*

Forensic analysis also revealed Muneeb used his Company-1 laptop to export more than 1,800 files related to Company-1 work for the U.S. Equal Employment Opportunity Commission (EEOC), which appeared to include software code, sensitive security files, and billing information. Law enforcement later discovered on Muneeb's phone that the Muneeb was logged into at least six email accounts that did not belong to him. All six people had used those same email accounts to file EEOC claims, and all six confirmed they did not authorize either defendant to access their accounts. A WhatsApp conversation prior to the defendants' Company-1 termination revealed Muneeb asking Sohaib to query a Company-1 database to send him the password for one of the email accounts Muneeb was logged into without authorization. The defendant provided that password.

*Prior Felony Convictions*

In 2015 at age 23, this Court convicted Sohaib of conspiracy to commit wire fraud, conspiracy to access a protected computer without authorization, and conspiracy to access a government computer without authorization. As a part of the plea agreement, the Government dismissed two counts of aggravated identity theft and one count of false statement.

The elaborate wire fraud scheme stole identities from customers of an Internet-based cosmetics company. Muneeb installed onto the computer system of the company computer code that automatically emailed the credit card numbers and means of identification of the identity theft victims to email accounts controlled by Muneeb. Muneeb provided that information to Sohaib. Sohaib and other coconspirators made purchases of goods with that stolen information using the identity theft victims' stolen credit card numbers. This scheme victimized more than 40 individuals and 20 businesses, totaling a loss that exceeded $30,000. Exhibit 1, Case No. 1-15-CR-124, Sohaib Akhter Statement of Facts, at 1–3.

When made aware of a pending search warrant for their residence in the previous case, Sohaib and Muneeb erased the contents of the email accounts they utilized to effectuate their scheme in order to prevent law enforcement from examining the accounts. *Id.* at 6.

Meanwhile in June 2014, the Department of Homeland Security hired Muneeb. The following conversation between the brothers ensued:

> **Sohaib**: You gotta case the joint. You gotta figure out exactly what's happening here and there and have an elaborate scheme built out that you'll never leave a trace.
>
> **Muneeb**: Yeah, you first climb the ladder before you . . . . Know your shit. Need to know who's watching, what they're watching, and luckily I'm one of the people that are watching, so I know what kind of evades.
>
> **Sohaib**: Yeah. but I'm pretty sure they have insider protection methods and you gotta figure that shit out.
>
> **Muneeb** : Yeah.
>
> **Sohaib**: Best not to be the first person to do shit. See around, do it for probably a year or so, make sure that other people . . . .
>
> **Muneeb**: We get access to a lot of different viruses, malware strains, just because you're watching the packets and you see that this thing is malicious and you can download their binaries, their weird malware. Wonder if you could really retool it such that it becomes a weapon on your part.
>
> *Id.* at 7–8.

A few months later, Sohaib attained a job for an information technology support company for the State Department. He used his position to search for and access sensitive passport information belonging to at least 62 people, including coworkers, acquaintances, a former employer, and several federal agents investigating him. After accessing this information, he copied, saved, and shared it with his coconspirators. On February 15, 2015, Sohaib attempted to secretly install a physical device on State Department computer systems so he could remotely access individuals' passport applications, unilaterally

approve visa applications without State Department authorization in exchange for payment, and create passports and visas to sell. *Id.* at 11–13.

For these offenses, the Honorable District Court Judge T.S. Ellis, III, sentenced Sohaib to 24 months of imprisonment and 3 years of supervised release. Case No. 1:15-CR-124, Dkt. 80.

### Supervised Release Violations

The Bureau of Prisons released Sohaib on October 10, 2017. On June 22, 2018, the Court found Sohaib in violation of his supervised release by failing to comply with computer monitoring requirements and his supervising officer's directives. *Id.*, Dkt. 160. After a resulting two weekends of confinement, the defendant again violated his term of supervision by providing still-incarcerated Muneeb with a modified MP3 player designed to circumvent prison parameters. For that, he served six weekends of confinement. *Id.*, Dkt. 191. Next on February 22, 2019, the Court found Sohaib in violation for using an unmonitored device. *Id.*, Dkt. 225. On May 10, 2019, the Court found the defendant again used an unmonitored device, which resulted in a 30-day step-back. *Id.*, Dkt. 244.

In May 2020, Arlington County charged Sohaib with threat to extort money and grand larceny, eventually converted to one felony charge of altering/forging vehicle registration. Arlington County then charged Sohaib with obtaining money by false pretenses, obtaining documents not entitled to, forgery and uttering, and two counts of perjury. In January 2021, the General District Court in Fairfax County found Sohaib guilty of obtaining money by false pretenses and false statement to obtain property/credit. He appears to have served one month in custody for these offenses. This Court subsequently found Sohaib in violation of his conditions of his federal supervised release, remanded him to serve ten days in custody, and his supervision was terminated. Case No. 1:15-CR-124, Dkt. 314.

*Weapons Offenses*

On March 12, 2025, law enforcement executed residential search warrants at Muneeb and Sohaib's respective then-residences (Muneeb had fled to his parent's house in Texas within days of the Company-1 termination and database deletions). Despite the search warrant authorizing the collection of Sohaib's personal cell phone, his then-current device was not recovered at the Alexandria residence. During the simultaneous Alexandria and Texas searches, law enforcement in Texas witnessed Sohaib attempting to call his parents, indicating Sohaib likely had possession of an undisclosed device.

While the search of Sohaib's Alexandria residence was ongoing, he left the scene. Law enforcement followed his vehicle to a residence in Maryland. When law enforcement knocked on the door, Sohaib's grandmother answered. She claimed he was not there. After pressing, she admitted he was.

In Sohaib's personal vehicle in Alexandria, law enforcement discovered .32 caliber ammunition in the middle console between the driver and passenger seats. Law enforcement also found at the residence an ammunition box containing .376 rounds and rifle ammunition. No weapons were recovered during the March 12, 2025 search.

Law enforcement executed a second search warrant on Sohaib's residence when arresting him pursuant to the arrest warrant issued in this case on December 3, 2025. His cell phone he used then and in March was recovered. Messages and pictures on the cell phone revealed that Sohaib likely obtained firearms at least as early as January 2025. In the days after the March 2025 search, communications from his cell phone indicate that Sohaib took various steps to dispose of firearms in his possession. Sohaib messaged a potential buyer: ""I'll give it all up for $4k with mags, gear, ammo, etc." and "I'm throwing in the $200 rifles along with the ruger hand gun in for free." Gmail artifacts indicated that Sohaib created an account, "gottasell5@gmail.com," which he was

logged into on his iPhone. He appears to have signed up for an account on "vaguntrader.com." To a different gun trader, the email gottasell5@gmail.com wrote, "Here is a compressed zip of all the gun pictures. Google really doesn't like sending pics of any pew-pews." The pictures depict Sohaib's hands holding various weapons with distinct features of his Alexandria residence in the background of some of the pictures. Ultimately, on March 18, 2025, Sohaib drove to a firearm company in Farnham, Virginia with his domestic partner. Paperwork from the transaction showed Sohaib's domestic partner completed the paperwork to sell the company seven firearms.

### *Witness Tampering & Intimidation*

On December 18, 2025, the government conducted a reverse proffer with Sohaib and his counsel. In that reverse proffer, the government forecasted that a superseding indictment with weapons charges may be forthcoming. On that same day, when Sohaib returned to the Alexandria Detention Center where he was being held pursuant to this Court's detention order, he called his domestic partner. He said:

> **I need you to be quiet at this point, but, like, listen to the whole story and then you can say something.** They wanna charge me with unauthorized weapon sales or something. I told my lawyer that you purchased the house, it's under your name, under your company. That **you basically got some company to clean out the house and found something**. Alright. And that **you figured out where to sell it** and went there to sell it. I might've accompanied you on that trip but it was you who signed off on the sale, **it was all yours**, because it was proceeds from your cleaning of the house, from your purchase of the house. You got it?

Numerous text messages on Sohaib's phone reveal he was present when he himself found and took possession of the weapons, not "some company." Numerous messages and e-mails demonstrate he is the one who "figured out where to sell" the weapons. And messages after the sale occurred also indicate that Sohaib received the proceeds—he wrote to an associate, "We sold the guns / I'll Zelle you some money."

*Jail Communications Circumvention*

On December 22, 2025, the Alexandria Detention Center notified the government that the defendants "were working with others on the outside to circumvent security controls and restrictions of [the detention center's] Smart Communications inmate tablet system."

Review of Sohaib's Smart Communications inmate tablet system revealed numerous messages from Sohaib to his domestic partner indicative of attempts to bypass the communications management system. *See* Exhibit 2.

A recorded jail call also revealed Sohaib told a family member the personal cell phone number of the lead investigator of this case lives. That information is not public.

*Mysterious Finances*

To pretrial services in December 2025, the defendant reported assets in a personal checking account of $1,800. Dkt. 16 at 2–3. Although his domestic partner told pretrial services the defendant was unemployed, he reported a $2,800 per month salary in a job he had for the three prior months. Before that, he was unemployed for six months. He and his domestic partner do not share finances.

Despite the limited income and single personal checking account the defendant described to pretrial services, the defendant has an account with Moomoo Financial, Inc., a trading and investment application showing significant activity by the defendant from March through June 2025. In March 2025, just weeks after the defendant and his twin brother conspired to, among other things, destroy government data, and his twin brother stole government data, the defendant paid in cash a personal loan he took out with Apple Federal Credit Union in the amount of approximately $36,000. In June 2025, while unemployed, the defendant deposited $10,100 into a Truist account from an ATM.

## PROCEDURAL HISTORY

The Government adopts the "Relevant Procedural Background" paragraphs 1–8 of the Defendant's motion. *See* Dkt 50.

## LEGAL FRAMEWORK

A defendant ordered detained by a United States Magistrate Judge may, by motion, seek amendment or revocation of his detention order. *See* 18 U.S.C. § 3145(b). "When the district court acts on a motion to revoke or amend a magistrate judge's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam) (citing *United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir. 1992)).

In a pretrial detention hearing, the government's burden is to establish by clear and convincing evidence that no conditions of release will reasonably assure the safety of the community. *United States v. Rodriguez*, 897 F. Supp. 1461, 1463 (S.D. Fla. 1995) (*citing United States v. Orta*, 760 F.2d 887 (8th Cir. 1985); *see also United States v. Arena*, 894 F. Supp. 580, 585–86 (N.D.N.Y. 1995) (*citing United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985)). "The issue in such a hearing is whether releasing a defendant would pose a danger to the community that would not exist were [the defendant] detained." *Rodriguez*, 897 F. Supp. at 1463 (*citing United States v. Phillips*, 732 F. Supp. 255, 267 (D. Mass. 1990), *reh'g denied*, 952 F.2d 591 (1st Cir.), *cert. denied*, 113 S.Ct. 113 (1992); *see also United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996) (per curiam); *United States v. Portes*, 786 F.2d 758 (7th Cir. 1985); *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985).

"With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence at future court proceedings." *Stewart*, 19 F. App'x at 48.

The factors the court must consider in evaluating release are set forth in 18 U.S.C. § 3142(g) and include:

1) the nature and circumstances of the offense charged;

2) the weight of the evidence against the person;

3) the history and characteristics of the person; and

4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

For the reasons that follow, the Court should find, as did the Honorable William Fitzpatrick and Pretrial Services, that there are no conditions other than detention that will reasonably assure the safety of the community and the defendant's appearance at future court proceedings.

## ARGUMENT

In consideration of the 18 U.S.C. § 3142(g) factors, any combination of conditions of release—including home confinement and electronic monitoring—are insufficient to ensure the safety of the community and the defendant's presence at trial.

*Nature and circumstances of the offenses*

The nature and circumstances of the offenses demonstrate Sohaib's level of sophistication and motivation for deceit pose a demonstrable danger to the community.

Courts recognize that economic harm constitutes a danger to the community. *See United States v. Reynolds*, 956 F.2d 192, 193 (9th Cir. 1992) (holding "that danger may . . . encompass pecuniary or economic harm."); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1270 (S.D. Fla. 2005) (stating there is "no question that an economic danger, like that posed by a serial defrauder, falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act" (citation omitted)); *United States v. Masters*, 730 F. Supp. 686, 689 (W.D.N.C. 1990) ("Defendant asserts that he does not pose a physical danger to the community. However, the Court believes it must also consider the danger of a person who continues to participate in possibly

fraudulent schemes."); *United States v. Persaud*, 2007 WL 1074906, at *1 (N.D.N.Y. April 5, 2007) ("Economic harm qualifies as a danger within the contemplation of the bail reform act."). *See also United States v. Muhammad*, No. 1:25-CR-284 (RDA), 2025 WL 3553204, at *4 (E.D. Va. Dec. 11, 2025).

Here, during the conspiracy, Sohaib suggested "deleting all their databases," told Muneeb that "deleting their filesystems would be a harder fix," watched and narrated as the deletions occurred, suggested numerous specific agency databases to carry the plan out on, and discussed the arrangement to clean out a secret house in preparation for a "raid" as a result of the offenses. These statements all place Sohaib firmly in conspiracy to destroy large amounts of sensitive government data. The economic fallout of the offense is substantial and ongoing.

As to the other category of the offenses with which the defendant is charged, courts are divided over whether a felon-in-possession offense is a crime of violence warranting pretrial detention.[1] This Court need not decide the contested issue. It should nonetheless consider that the defendant, a felon, possessed, concealed from law enforcement, and deceitfully disposed of numerous instrumentalities of violence. At the first search of his car and home in March 2025, the center console of his vehicle had in it loose ammunition. His affiliation with weapons is thus more widespread than the defense counsel's "preliminary investigation" indicating the possession of firearms merely involved the disposal of them to a licensed person. The lengths to which the defendant went to conceal his firearms further highlight the danger of his possession: he stored them at an undisclosed location not searched by law enforcement, surreptitiously disposed of the

---

[1] *Contrast United States v. Dillard*, 214 F.3d 88 (2nd Cir. 2000) (finding felon-in-possession offense to be a crime of violence warranting a detention hearing) *with United States v. Ingle*, 454 F3d 1082 (10th Cir. 2006) (finding felon-in-possession offense not to constitute a crime of violence under the meaning of the Bail Reform Act). *See also United States v. Singleton*, 182 F.3d 7, at 12–13 (D.C. Cir. 1999) (aggregating the district court splits on whether 18 U.S.C. § 922(g) constitutes a crime of violence triggering a detention hearing).

weapons, involved another in his deceit, and then attempted to coerce the witness of that crime to abide by a concocted narrative.

A related concern is the prism through which the Government requested this defendant's detention hearing: a serious risk, which came to fruition, the defendant would "obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." *See* 18 U.S.C. § 3142(f)(2). In *United States v. LaFontaine*, 210 F.3d 125, 128 (2d Cir. 2000), the government moved to revoke that defendant's pre-trial release when she engaged in obstruction and witness tampering by attempting to influence the testimony of witnesses. On appeal of her remand to federal custody, LaFontaine argued her detention was improper because there was no evidence she employed or threatened violence as a part of the witness tampering. The Second Circuit rejected that contention and found that even a non-violent witness tamperer could be deemed dangerous. Hereto, the defendant learned in a reverse proffer the government was investigating possible weapons charges, and he immediately called the witness to that crime to shape and falsify her narrative. His coercion was unrestrained by the constraints of a recorded jail line as he errantly proclaimed at the beginning of the call it was "privileged"[2] and he prevented the witness' input by declaring, "I need you to be quiet at this point, but, like, listen to the whole story . . . ."

In sum, the nature and circumstances of the defendant's offenses poses a demonstrable risk to the community and witnesses.

*Weight of the evidence.*

The weight of the evidence is strong. The initial conspiracy was captured on a Microsoft Teams video recording that the conspirators neglected to close after the end of the meeting in

---

[2] To remove any doubt, these communications would not be privileged even if Sohaib were married to his domestic partner. *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998); *United States v. Warrick*, 2014 WL 229565, at *1 (E.D. Va. Jan. 21, 2014); *United States v. Ramsey*, 786 F. Supp. 2d 1123, 1126 (E.D. Va. 2011).

which they were terminated from Company-1. Company-1 provided the video. The call for which the defendant is charged with witness tampering was likewise recorded. Finally, the defendant's phone contained numerous photos of his hands holding weapons, the email account he created to sell the weapons, and a witness at the gun store will confirm the defendant's domestic partner was accompanied by a man during the transaction in which the weapons were sold. Accordingly, this factor weighs strongly in favor of detention.

### *History and characteristics*

The defendant's history is replete with persistent illegal conduct undeterred by prior convictions, conditions on supervision, and even the strictures of a detention facility. Sohaib steers his technological sophistication to installing malware, disabling electronic monitoring software, and elaborate schemes resulting in economic harm. These characteristics and his long list of fraudulent crimes and violations of supervision make containing his obstructive motivations impossible on any level of monitoring.

His history and deceitful characteristics also make him a flight risk. Sohaib has demonstrated patchy employment history mired in misconduct. In December 2025, the defendant reported to pretrial services a monthly income of $2,800; his domestic partner thought he was unemployed. Dkt. 16 at 2. There is an inexplicable gap between the assets the defendant reports and the amount of tens of thousands of dollars in deposits and transactions he is making with multiple banking entities. These conflicting accounts are further evidence of the defendant's efforts to, at worst, control and, at best, leave in the dark both pretrial services and his proposed third-party custodian.

Finally of note, the defendant's 2015 crimes involved obtaining 62 passports from the State Department in 2015. In 2019, he stole the identity of a Maryland citizen and attempted to secure a

Maryland identification card in that person's name. His history of and ability to access identification documents make the government's possession of his passport obsolete.

*Nature and Seriousness of Danger to the Public if Released*

The seriousness of the danger to any person or the community posed by the defendant's release are serious and weigh in favor of detention. Felony and state laws, company policies, and technological gatekeeping has not stopped Sohaib from committing significant economic harm. Federal supervision and the monitoring of the Alexandria Detection Center has not stopped him from witness tampering and circumventing system protections. A third-party custodian certainly cannot either.

The defendant has not proposed conditions of release to ensure compliance; nonetheless, any such proposal would be insufficient because the defendant has shown himself to be a noncompliant, deceptive person—both with law enforcement and with the people who are allegedly closest to him.

Further, the currently proposed third-party custodian is unsuitable. It remains unclear why the defendant insists she is his wife, yet she denies being married to him. She travels with some frequency to Bangladesh, where she is believed to be located at the time of this filing. But most importantly, it is the responsibility of a third-party custodian to report to pretrial any violations of the defendant's conditions of release. The third-party custodian cannot report what the defendant successfully hides from her or what the defendant makes her a part of. Here, the defendant employed his proposed third-party custodian to aid and abet his unlawful possession of a firearm. He then instructed her to falsify a narrative around it. She did not report those crimes and cannot be trusted to report his unauthorized access of electronic devices. Further, even while he is in jail, she is following his instructions to bypass restrictions. Exhibit 2.

Even with a suitable third-party custodian and electronic monitoring, the defendant has a habit of bypassing the monitoring. Obtaining new electronics is cheap and easy, and nearly impossible for a third-party custodian to prevent or monitor. It is not possible to monitor someone 24 hours a day outside of a jail, no matter how well-intentioned. The defendant's domestic partner works and travels internationally. Dkt. 16 at 2. She would not be able to monitor the defendant's behavior all the time and there is no indication in either the pretrial services report or the defendant's instant motion to indicate whether *she* would agree to divest of, or password protect, all electronic devices in the home. Furthermore, it is unclear whether the defendant's domestic partner has the technological sophistication to adequately supervise a defendant who is himself technologically savvy and has taken steps to conceal his criminal activities online. If the defendant can bypass a communications system used by correctional facilities nationwide, he certainly can bypass any efforts of a third-party custodian.

## CONCLUSION

The defendant's pattern of misconduct is serious and undeterrable. He will be a danger to the integrity of the judicial process and the economic safety of the community if released, no matter how strict the conditions. His history and characteristics pose a significant risk of flight. Accordingly, the government respectfully requests that the Court deny the defendant's motion and order the defendant be detained pending trial.

Respectfully submitted,


Todd W. Blanche
Deputy Attorney General


Date:    <u>January 27, 2026</u>


By: _____/s/_____
Vanessa Strobbe
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: 703-299-3708
Email: vanessa.strobbe@usdoj.gov


George Brown
Stefanie A. Schwartz
Trial Attorneys
U.S. Department of Justice
Criminal Division
Computer Crime and Intellectual Property Section
1301 New York Ave NW, Suite 600
Washington, DC 20530
Phone: (202) 514-3597
Email: george.brown@usdoj.gov